## NORTH CAROLINA ET AL. *v.* UNITED STATES ET AL.

NO. 560.

Argued April 23, 24, 1945.—Decided June 11, 1945.

508

*Messrs. J. C. B. Ehringhaus* and *F. C. Hillyer* for appellants in No. 560. *Messrs. Richard H. Field, David F. Cavers* and *Malcolm D. Miller* submitted for appellants is No. 561.

*Mr. J. Stanley Payne,* with whom *Mr. Daniel W. Knowlton* was on the brief, for the Interstate Commerce Commission, and *Mr. Charles Clark,* with whom *Mr. Frank W. Gwathmey* was on the brief, for the Aberdeen & Rockfish Railroad Co. et al., appellees.

MR. JUSTICE BLACK delivered the opinion of the Court.

The North Carolina State Utilities Commission brought suit to enjoin enforcement of an order of the Interstate

Commerce Commission. 258 I. C. C. 133. The Federal Economic Stabilization Director acting through the Price Administrator sought and was granted the right to intervene as a party plaintiff. A federal district court of three judges denied the injunction, 56 F. Supp. 606, and the case is here on direct appeal under § 210 of the Judicial Code.

This clash between state and federal agencies came about because the State Commission and the Interstate Commerce Commission each claimed the paramount power to fix railroad rates in North Carolina. The North Carolina Commission ordered railroads doing business in the state to charge no more than 1.65 cents per mile for carrying intrastate coach passengers from one point in the state to another. Despite this State Commission order, the Interstate Commerce Commission authorized the same railroads to charge 2.2 cents per mile for the same type of carriage.[1]

The Interstate Commerce Commission asserted its power to prescribe these purely intrastate rates under § 13 (4) of the Interstate Commerce Act. 49 U. S. C. § 13 (4). That section, which is set forth below,[2] empow-

---

[1] There is a corresponding conflict which involves round trip coach rates. The questions presented are the same with regard to one way and round trip rates, and we shall therefore consider both of them by reference to the one way rate.

[2] "Whenever in any such investigation the Commission, after full hearing, finds that any such rate, fare, charge, classification, regulation, or practice causes any undue or unreasonable advantage, preference, or prejudice as between persons or localities in intrastate commerce on the one hand and interstate or foreign commerce on the other hand, or any undue, unreasonable, or unjust discrimination against interstate or foreign commerce, which is hereby forbidden and declared to be unlawful, it shall prescribe the rate, fare, or charge, or the maximum or minimum, or maximum and minimum, thereafter to be charged, and the classification, regulation, or practice thereafter to be observed, in such manner as, in its judgment, will remove such advantage, preference, prejudice, or discrimination. Such rates, fares, charges, classifications, regulations, and practices shall be observed

ers the Interstate Commerce Commission to prescribe intrastate railroad rates under certain conditions, despite conflicting state orders as to the same rates. The conditions that Congress imposed as a prerequisite to Commission action are that the Commission shall hold a "full hearing" and find that the state-prescribed rates either caused (1) undue or unreasonable advantage, preference, or prejudice, as between persons or localities in intrastate commerce on the one hand, and interstate commerce on the other hand, or (2) undue, unreasonable, or unjust discrimination against interstate commerce. The Commission held hearings which are challenged on various grounds as falling short of "full" hearings. It made findings and concluded that the 1.65 state rate was unduly prejudicial to interstate passengers, and that the state rate constituted an undue and unjust discrimination against interstate commerce. These conclusions are attacked on the ground that they are supported neither by findings nor evidence. The crucial question involved in all these contentions is whether the indispensable prerequisites to the exercise of the Federal Commission's power over intrastate rates have been shown to exist with sufficient certainty. Before making any detailed reference to the hearings, findings or evidence, it would be helpful to set out certain guiding principles which lead us to a resolution of the crucial question.

Section 13 (4) does not relate to the Commission's power to regulate interstate transportation as such. As to interstate regulation, the Commission is granted the broadest powers to prescribe rates and other transportation details. See *United States* v. *Pennsylvania R. Co.*, 323 U. S. 612. No such breadth of authority is granted to the Commission over purely intrastate rates. Neither § 13

while in effect by the carriers parties to such proceeding affected thereby, the law of any State or the decision or order of any State authority to the contrary notwithstanding." 49 U. S. C. § 13 (4).

(4), nor any other Congressional legislation, indicates a purpose to attempt wholly to deprive the states of their primary authority to regulate intrastate rates. Since the enactment of § 13 (4), as before its enactment, a state's power over intrastate rates is exclusive up to the point where its action would bring about the prejudice or discrimination prohibited by that section. When this point—not always easy to mark—is reached, and not until then, can the Interstate Commerce Commission nullify a state-prescribed rate.

Intrastate transportation is primarily the concern of the state. The power of the Interstate Commerce Commission with reference to such intrastate rates is dominant only so far as necessary to alter rates which injuriously affect interstate transportation. *American Express Co.* v. *South Dakota,* 244 U. S. 617, 625. A scrupulous regard for maintaining the power of the state in this field has caused this Court to require that Interstate Commerce Commission orders giving precedence to federal rates must meet "a high standard of certainty." *Illinois Central R. Co.* v. *Public Utilities Commission,* 245 U. S. 493, 510. Before the Commission can nullify a state rate, justification for the "exercise of the federal power must clearly appear." *Florida* v. *United States,* 282 U. S. 194, 211–212. See also *Yonkers* v. *United States,* 320 U. S. 685. And the intention to interfere with the state's rate-making function is not to be presumed, *Arkansas Commission* v. *Chicago, R. I. & P. R. Co.,* 274 U. S. 597, 603; nor must its intention in this respect be left in serious doubt. *Illinois Commerce Comm'n* v. *Thomson,* 318 U. S. 675, 684–685. The foregoing cases also stand for the principle that the Interstate Commerce Commission is without authority to supplant a state-prescribed intrastate rate unless there are clear findings, supported by evidence, of each element essential to the exercise of that power by the Commission. We shall now take up the two grounds upon which the Commission set aside the state order.

*Prejudice Against Interstate Passengers.* On this aspect of the case the Commission's findings were that the interstate 2.2 cents rate was just and reasonable; that the accommodations afforded interstate and intrastate passengers in North Carolina were "substantially similar"; that in general these passengers traveled in the same trains and in the same cars; and from these, it concluded that since interstate passengers were forced to pay higher fares than intrastate passengers, there was an undue and unreasonable disadvantage and prejudice of interstate passengers. On these findings it issued the statewide order requiring all intrastate passengers to pay 2.2 cents per mile. We think these findings failed to give adequate support to the order.

In effect, the Commission's holding was, and its argument is here, that § 13 (4) automatically requires complete uniformity in intrastate and interstate rates. That argument is in short that under our national transportation system interstate travelers and intrastate travelers use the same trains; for a state to fix a lower intrastate rate than the interstate rate is therefore an undue advantage to the intrastate passengers and an unfair discrimination against the interstate passengers. If Congress intended to permit such an oversimplified form of proof to establish "unjust discrimination," then its requirement of a "full hearing" was mere surplusage. In fact, it need have provided for no hearing at all since it could have easily stated in its legislation that intrastate rates shall never be lower than interstate rates. The argument of the Commission in this regard runs counter to the language of § 13 '(4), and would call for a declaration by us that Congress intended by this section to reverse the entire transportation history of the nation. The clause about "persons" and "localities" is, as the legislative history shows, a practical enactment into law of a decision of this Court in the

*"Shreveport"* case.[3] *Houston, E. & W. T. R. Co.* v. *United States,* 234 U. S. 342. In the *"Shreveport"* case the Commission found from evidence that certain Texas intrastate rates to Texas points were far below the interstate rates charged to carry the same types of freight from Shreveport, Louisiana. The distances and conditions of both transportations were found to be substantially the same. The Court sustained the Commission's conclusion that the Texas intrastate rates constituted an unfair discrimination against Shreveport and persons doing business there. The Commission's order was not statewide, but only required removal of the discrimination against the particular localities and business groups affected by the discrimination.

In *Railroad Commission* v. *Chicago, B. & Q. R. Co.,* 257 U. S. 563, 579, 580, this Court refused to sustain a Commission order nullifying all state passenger rates because of a discrimination against interstate travelers and against localities. The Commission had found there as here that state and interstate passengers rode on the same trains in the same car and perhaps in the same seats. It had found there, as it did here, that this constituted an undue discrimination against interstate passengers, and it issued a general sweeping order against all intrastate

---

[3] The House Committee reporting this bill said with reference to the provisions of § 13 (4): "After such hearing the Commission shall make such findings and orders as may in its judgment tend to remove any undue advantage, preference, or prejudice as between persons or localities in state and interstate or foreign commerce. The provision practically enacts into law the decision of the Supreme Court in the so-called 'Shreveport' case. Any undue burden upon interstate or foreign commerce is forbidden and declared to be unlawful. It is believed that the provisions of this section will have a beneficial and harmonizing effect, and will tend to reduce the number of so-called 'Shreveport' cases, while at the same time recognizing the regulatory bodies of the several States." Report No. 456, 66th Cong., 1st Sess., p. 20.

passenger rates. This Court pointed out that the order went far beyond the principles announced in the *Shreveport* case, and declined to sustain the statewide order on this phase of the case. See also *Florida* v. *United States,* 282 U. S. 194, 208. So here, the finding that interstate passengers paid higher fares than intrastate passengers for the same facilities is an inadequate support for nullifying state rates on the ground that they constitute unjust discrimination against interstate passengers.

*Discrimination Against Interstate Commerce.* One ground of the Commission's order was that the intrastate rates discriminated against interstate commerce as such. The findings of the Commission on which this conclusion rested were that the 2.2 cents interstate rate was just and reasonable; the same trains in general carried both interstate and intrastate passengers; the North Carolina railroads to which the intrastate rates were applied, would have received $525,000 more annual income from the passengers they carried had the 2.2 cents interstate rate been applied; from this the conclusion was reached that intrastate traffic was "not contributing its fair share of the revenue required to enable respondents to render adequate and efficient transportation service."

This conclusion of the Commission, if based on findings supported by evidence, would justify its order. For in *Florida* v. *United States,* 292 U. S. 1, 5, we said that § 13 (4) authorized the Commission "to raise intrastate rates so that the intrastate traffic may produce its fair share of the earnings required to meet maintenance and operating costs and to yield a fair return on the value of property devoted to the transportation service, both interstate and intrastate." We sustained the Commission's order there because it was based on findings supported by evidence that the intrastate rate "was abnormally low and less than reasonably compensatory . . . 'insufficient under all the circumstances and conditions to cover the full cost of the

service.' " Neither in its formal findings nor in its discussion of the facts did the Commission indicate that the North Carolina railroad rates here involved were less than compensatory or insufficient to cover the full cost of service. Nor did they find that maintenance of these rates was necessary to the operation of a nationally efficient and adequate railway system.[4]

---

[4] In *Railroad Commission* v. *Chicago, B. & Q. R. Co.*, 257 U. S. 563, this Court sustained a statewide Commission order raising intrastate rates. Section 13 (4) in the context of the 1920 Transportation Act, 41 Stat. 456, as it then existed, was construed as requiring the Commission to prescribe rates sufficient "to enable the carriers as a whole, or in groups selected by the Commission, to earn an aggregate annual net railway operating income equal to a fair return on the aggregate value of the railway property used in transportation." 584–585. The 1920 Act, however, treated the national railway system as a unit. The net returns for any particular railroad were limited by the Act. All above this limitation went into a common pool to be distributed for the use of weak railroads. In this way, all railway income inured to the benefit of all the railroads individually and collectively to aid in "maintaining an adequate railway system." This Court has said that Congress adopted the pooling provisions because "it was not clear that the people would tolerate greatly increased rates (although no higher than necessary to produce the required revenues of weak lines) if thereby prosperous competitors earned an unreasonably large return upon the value of their properties." *New England Divisions Case*, 261 U. S. 184, 191. But Congress in 1933, 48 Stat. 211, repealed this part of the 1920 Act; the income pooling system was abandoned; the rule of rate making was re-written, and while the Commission was to give consideration to the need of adequate and efficient railway transportation service at the lowest cost consistent with the furnishing of such service, and to the need of revenue sufficient to enable the carriers under honest, economical and efficient management to provide such service, the rates were no longer to be treated on a national basis as though all railroads constituted one system. House Report No. 193, 73rd Cong., 1st Sess., pp. 30–31. Railroads were to be treated on an individual basis. Abandonment of the profit pooling system made this necessary to carry out the continuing Congressional purpose to prevent "an unreasonably large return upon the value of their properties." The Commission recognized this legislative change in rate-making policies

But the question posed by the Commission's conclusion was whether the particular North Carolina railroads were obtaining from North Carolina's intrastate passenger rates their fair part of such funds as were required to enable these particular railroads to render adequate and efficient service. The Commission made no findings as to what contribution from intrastate traffic would constitute a fair proportion of the railroad's total income. It made no finding as to what amount of revenue was required to enable these railroads to operate efficiently. Instead, it relied on the mere existence of a disparity between what it said was a reasonable interstate rate and the intrastate rate fixed by North Carolina. It thought this action was justified by this Court's opinion in *Illinois Commerce Comm'n* v. *United States,* 292 U. S. 474, 485.[5] Aside from the fact that "the mere existence of a disparity between particular rates on intrastate and interstate traffic does not warrant the Commission in prescribing intrastate rates," *Florida* v. *United States,* 282 U. S. 194, 211–212; *Utah Edible Livestock Rates and Charges,* 206 I. C. C. 309, there is reasonable doubt as to whether the Commission had ever fixed 2.2 cents as the only reasonable interstate rate.

The whole argument that it had done so rests primarily on an order made in 1936. At that time, the Commission made a comprehensive investigation of rates throughout the nation, and after elaborate discussion made findings

by its reference to "revenues required to enable *respondents* to render adequate and efficient transportation service." The "respondents" referred to were the individual railroads to which North Carolina's order applied.

[5] This case did not involve a sweeping statewide order based on general railroad revenue needs. It related to a problem like that considered in the *Shreveport* case. The rates involved applied to switching movements in a single "Switching District," "essentially a unit, so far as switching movements are concerned." This Court's holding in that case does not support the statewide order here.

of fact. It concluded that any rate over 2 cents per passenger mile would be unreasonable and unlawful. But it also declared that a rate of 1.5 cents then commonly charged throughout the Southern states, would not be "unreasonable or otherwise unlawful." 214 I. C. C. 174, 257. Railroads in the South continued to charge 1.5 cents most of the time from then until 1942. March 2, 1942, upon an application of the American railroads, the Commission in *Ex parte 148*, granted a general 10% increase on all rates then in existence. This increase it found was necessary to enable the railroads "to continue to render adequate and efficient railway-transportation service during the present emergency." 248 I. C. C. 545, 565. The Commission specifically stated, p. 606, that its conclusion was not based on "individual, sectional, or particular industrial desires or needs." Four months later, on July 14, 1942, certain railroads operating in the South, including the railroads involved in the *North Carolina* case, filed a petition with the Commission asking that it modify its 1936 order, so as to permit them to charge 2.2 cents per mile. Two weeks later, without a hearing, without evidence, and without discussion, the Commission entered an order declining to amend its 1936 order, but modifying its 10% rate increase order, "so as to *authorize*" the petitioning railroads to charge 2.2 cents per mile. It made no finding that the railroads needed this increase in order to maintain adequate railroad systems and of course could not have done so unless it relied upon the old 1936 evidence. There was no issue of this nature raised by any of the parties in the 10% rate increase proceedings. Neither before nor since these Southern railroads were authorized by the Commission to increase their interstate rate to 2.2 cents has any hearing been held on the subject. Petition of North Carolina for a hearing was denied. Nor has there been any finding based on evidence that the 1.65 cents rate which the Commission

found adequate, and neither "unreasonable nor unlawful," has ceased to be such. We are unable to find from any of the various orders that the Commission has ever yet made findings supported by evidence and upon them set aside its 1936 conclusions that a 1.5 cents rate for Southern territory was reasonable and lawful, except to the extent that it held that a 10% increase was justifiable.

Furthermore, even assuming that the Commission had previously made a valid 2.2 cents per mile general order broadly applicable to all railroads in the Southern territory or throughout the nation, it does not follow that such a general order must permanently stand as to each and every separate railroad or railroad system. The very nature of such a broad general order requires that it contain a saving clause for future modification and adjustment of particular rates. This Court declared that such a saving clause was essential even at the time that all surplus railroad profits were pooled for the common good of the national system. *Railroad Commission* v. *Chicago, B. & Q. R. Co.,* 257 U. S. 563, 579; *Georgia Commission* v. *United States,* 283 U. S. 765, 772; *United States* v. *Louisiana,* 290 U. S. 70, 76, 77, 79.

Such a saving clause left to the state its power to bring about particular changes in the internal intrastate rate structure necessary to keep intrastate revenues as a class in harmony with interstate needs. *Railroad Commission* v. *Chicago, B. & Q. R. Co.,* 257 U. S. 563, 580. For the Interstate Commerce Commission was "without jurisdiction over intrastate rates except to protect and make effective some regulation of interstate commerce." *Illinois Commerce Comm'n* v. *Thomson,* 318 U. S. 675, 684. Consequently, no one but the state had power to readjust its internal intrastate rate structure. This it undertook to do by a hearing focussed upon the state railroads individually and collectively. Four railroads were denied the increase,

and they are the only ones now affected by the Interstate Commerce Commission order. Other roads were granted the increase. Its order to this effect rested on evidence as to the differing qualities of intrastate and interstate accommodations afforded as well as the net revenues of different roads. The State Commission found as to the four roads which it denied an increase that their profits from passenger revenues even on a 1.65 cents rate were so great that continuance of that rate would be reasonable and just to them.

In the proceedings before the Interstate Commerce Commission, the state and the Price Administrator presented these issues which the State Commission had considered. Both the railroads and their adversaries offered evidence on the points. There was evidence that the four railroads were carrying more passengers and more freight, and were more prosperous than they had ever been in their history. This evidence showed that they were in the highest excess profit tax brackets, and that somewhere between 80 and 90% of all their profits were subject to be paid for federal taxes.

There was evidence offered by the railroads, which indicated that their 1942 per mile net cost of carrying coach passengers was under or about 1 cent. The Commission had found facts in the 1936 report, 214 I. C. C. at pp. 216, 266, which indicated a mileage coach passenger cost of 3.25 cents. Evidence of the four railroads also showed their average revenue increase since 1936 had been approximately 250%. This great revenue increase transformed a 1936 $16,426.00 deficit of six North Carolina roads, including the four here involved, into a 1942 $26,699,988.00 profit. Most of this increased profit was shown to have been derived from passenger revenues.

All of this evidence and much more to which we might advert was sufficient to show that the Commission might have found, had it made any findings on the subject at all,

that a 1.65 cents rate for these four North Carolina railroads would have been a fair coach passenger contribution to revenues required to enable them to operate profitably and efficiently. But it made no findings on this subject at all. The purpose of the National Transportation Law is to assure railroads a fair net operating income and no more. *Dayton-Goose Creek R. Co.* v. *United States,* 263 U. S. 456. The power of the Commission to require states to raise their intrastate rates depends upon whether intrastate traffic is contributing its fair share of the earnings required to meet maintenance and operating costs and to *yield a fair return on the value of property directed to the transportation service* both interstate and intrastate. *United States* v. *Louisiana,* 290 U. S. 70, 75. But the Commission cannot "require intrastate rates to be raised above a reasonable level." *United States* v. *Louisiana, supra,* 78. And where there is evidence as here from which the Commission could have found that a rate of 2.2 cents was far above a reasonable rate level for the intrastate coach traffic of these four railroads, the Commission must make findings on that issue, which findings are supported by evidence, before entering an order supplanting the state authority. Without such findings supported by evidence, the Commission was not authorized to find that the intrastate rates discriminated against interstate commerce.

Because the order of the Commission was not based on adequate findings, supported by evidence, the District Court should have declined to enforce its order. The judgment of the District Court is

*Reversed.*

MR. JUSTICE REED, dissenting.

The Court has set aside an order of the Interstate Commerce Commission which was entered May 8, 1944, on a Commission report of the preceding March 25th. 258 I. C. C. 133. The order covered investigations instituted

upon separate petitions of carriers in North Carolina, Kentucky, Alabama and Tennessee to determine whether the maintenance of intrastate fares in these states at levels below fares and charges established for application to interstate traffic in respective states on October 1, 1942, caused undue or unreasonable advantage, prejudice or preference between persons or localities in intrastate commerce on the one hand, and interstate commerce on the other, or any such discrimination against interstate commerce. 49 U. S. C. § 13 (4). The petitions sought, too, prescription of fares and charges by the Commission to remove any preference, advantage, prejudice or discrimination found to exist. See also *Alabama* v. *United States* and *Davis* v. *United States, post,* p. 535. This dissent is applicable both to this and that opinion.

Without summarizing the entire report we call attention to a finding which it contains that traffic moving under these lower intrastate fares is not contributing its fair share of the revenues required to enable appellees (the interstate carriers) to render adequate and efficient transportation service and that this "unlawfulness should be removed by increasing" the intrastate fares to the level of the interstate fares. 258 I. C. C. 154, 155, Findings 5 and 6. This finding, if supported by evidence, is in our opinion sufficient to justify the applicable order of May 8th which is under review in this appeal. That order required the carriers to maintain and apply intrastate fares on bases no lower than those applied by the carriers in interstate transportation to, from and through the four states.

The Interstate Commerce Commission has the power to make this order on a valid finding of such discrimination against interstate commerce. 49 U. S. C. § 13 (4). It has long been established that this section delegates a valid power of regulation of intrastate rates to the Commission. *Railroad Commission* v. *Chicago, B. & Q. R. Co.,* 257 U. S. 563. Cf. *Minnesota Rate Cases,* 230 U. S.

352, 432, and *Houston, E. & W. T. R. Co.* v. *United States* (the *Shreveport* case), 234 U. S. 342, 351. It gives authority to the Commission to raise intrastate rates so that that traffic may produce its fair share of the required earnings. *United States* v. *Louisiana,* 290 U. S. 70, 75. And that authority does not depend upon the recapture, in whole or in part, of excess earning of individual railroads under the requirements of the Transportation Act of 1920, 41 Stat. 488, § 15a, now repealed, Emergency Railroad Transportation Act, 1933, 48 Stat. 220, § 205, for creation of a general railroad contingent fund for financing the national transportation system of railways. Section 13 (4) was not changed by the Act of 1933. This section in conjunction with the revised and reenacted § 15a of the Interstate Commerce Act now empowers the Commission, in accordance with the statutory provisions, to remove the discrimination against interstate commerce by prescribing intrastate fares.[1] *Florida* v. *United States,* 292 U. S. 1, 4, First. Cf. *Illinois Commerce Comm'n* v. *Thomson,* 318 U. S. 675, 682. This Court today recognizes this rule. The four states attack the finding of discrimination against interstate commerce, which finding is essential to the validity of the present order to maintain intrastate fares at the level of interstate fares, on the ground that there is neither finding nor evidence that the intrastate rates are

---

[1] The present § 15a, 49 U. S. C., reads as follows:

"(1) When used in this section, the term 'rates' means rates, fares, and charges, and all classifications, regulations, and practices relating thereto.

"(2) In the exercise of its power to prescribe just and reasonable rates the Commission shall give due consideration, among other factors, to the effect of rates on the movement of traffic by the carrier or carriers for which the rates are prescribed; to the need, in the public interest, of adequate and efficient railway transportation service at the lowest cost consistent with the furnishing of such service; and to the need of revenues sufficient to enable the carriers, under honest, economical, and efficient management to provide such service."

not producing a proper proportion of the carriers' needed revenue. This Court sustains the attack as sufficient to invalidate the Commission order. We think the argument, which the Court has sustained, has its source in a misconception of the purpose of this present proceeding.

The petitions were filed by the carriers, the investigation was made and the order under dispute here was entered to coordinate the intrastate passenger fares in these four states with the passenger fare structure of the entire country. 258 I. C. C. 133. There had been a number of recent proceedings involving the national structure. The evidence, which will be referred to later, presented in those proceedings is, we think, properly to be considered in this investigation and the power of the Commission to require intrastate fares to conform to interstate fares in the four states is to be appraised in the light of a purpose to establish a national passenger rate structure. The Court apparently accepts as a premise the contention of the states that the present proceeding is an isolated investigation by the Commission into an application by the respective carriers in the four states to have their intrastate fares raised to the level of their interstate fares because the intrastate earnings were below a fair proportion of the carriers' total required income.[2] Instead we think that

---

[2] Compare the following excerpt from the opinion of the Court: "But the question posed by the Commission's conclusion was whether the particular North Carolina railroads were obtaining from North Carolina's intrastate passenger rates their fair part of such funds as were required to enable these particular railroads to render adequate and efficient service. The Commission made no findings as to what contribution from intrastate traffic would constitute a fair proportion of the railroad's total income. It made no finding as to what amount of revenue was required to enable these railroads to operate efficiently. Instead, it relied on the mere existence of a disparity between what it said was a reasonable interstate rate and the intrastate rate fixed by North Carolina. It thought this action was justified by this Court's opinion in *Illinois Commerce Comm'n* v. *United States,* 292 U. S. 474, 485."

these proceedings are but another step in the comprehensive regulation by the Commission of the general passenger fare structure.

*Basic Interstate Fares.* The basic passenger fares were first investigated on a national scale by the Commission in *Passenger Fares and Surcharges,* No. 26550, decided February 28, 1936. In this proceeding carrier coach and pullman fares respectively were fixed at not to exceed 2 and 3 cents per passenger mile. 214 I. C. C. 174, 256.[3] The order, see paragraph 3, page 257, left these respondent roads in the southern territory free to continue certain experimental fares, which were as low as 1.5 cents per mile in coaches. A ten per cent increase, applicable to both the basic 2 and 3 cent fares and the experimental fares, was allowed on January 21, 1942, in a proceeding before the Commission, docketed as *Ex parte No. 148, Increased Railway Rates, Fares, and Charges,* 248 I. C. C. 545, 549, 564, 566, 612. A reference to the Commission's

---

[3] States made the earliest efforts to limit passenger fares. E. g. Kansas, 1901, § 66–167, Revised Statutes of Kansas (1923); North Dakota, 1907, § 4796, Compiled Laws of North Dakota (1913); Illinois, 1907, § 170, Callaghan's Illinois Statutes Annotated (1924); Iowa, 1913, § 8126, Code of Iowa (1924). Such limitations were, of course, not uniform. On May 25, 1918, by General Order No. 28, the United States Railroad Administration in order to increase the operating revenue fixed the national basic passenger fare in coaches, interstate and intrastate, at not less than 3 cents per mile, with a surcharge for pullmans. This produced a considerable degree of uniformity. An increase of 20% or to 3.6 cents was made as of August 26, 1920. In the depression of the 1930s certain carriers operating in southern territory experimented with fair success on revenues with fares as low as 1.5 cents per mile in coaches. *Alabama Intrastate Fares,* 258 I. C. C. at 134.

Approximate uniformity before 1936 was maintained by the Commission's use of 13 (4) orders to bring intrastate fares into line with interstate fares. The Commission found it more convenient later to secure state adoption of its rates by cooperation through agreement. See Sharfman, The Interstate Commerce Commission II, pp. 287–344.

decisions in the above proceedings will indicate the full hearing which was given the fare problems in those cases. In the *Passenger Fares* case, the report of the Commission, 214 I. C. C. at 175, shows that all carriers by railroad subject to the act were made respondents and that a committee of the State Commissioners cooperated with the Commission in determining the issues. In the *Increased Railway Rates* case, all the states were notified of the pendency of the proceeding and a committee of the state commissions also attended the hearing and oral argument and conferred as to the determination of the issues. 248 I. C. C. at 549. All rail carriers were again before the Commission.

After the ten per cent increase, the railroads of southern passenger association territory filed, on July 14, 1942, a petition in *Passenger Fares and Surcharges,* No. 26550, seeking a modification of paragraph 3 of the conclusions, 214 I. C. C. at 257, to enable them to file tariffs increasing their coach fare to 2.2 cents (2 cents plus 10 per cent). The Commission ruled that its former decision in No. 26550, 214 I. C. C. at 256, permitted all railroads, respondents therein, which included applicants, to charge a basic fare of 2 cents and that a general increase of 10 per cent on these rates had been authorized in *Ex parte No. 148,* and that therefore the Commission could and it did authorize the application of the 2.2 cent basic rate to interstate rates in southern territory. The Commission by order of August 1, 1942, directed that the petition in No. 26550 be denied, evidently because the order in that number had been superseded by the "Increased Rates" proceedings, *Ex parte No. 148,* and that its order in *Ex parte No. 148* be modified to effectuate this increase and that it be left otherwise unchanged.[4] The participating

---

[4] *"It is further ordered,* That the order of January 21, 1942, in Ex parte No. 148, be, and it is hereby, further modified so as to authorize the aforesaid petitioners to apply the increase of 10 per cent approved

carriers then approached the separate state authorities to obtain their consent to the increase for intrastate passenger traffic in accordance with the recitation in the order of January 21, 1942, in *Ex parte No. 148*.[5] On the refusal of the rate regulatory authorities of North Carolina, Alabama, Tennessee and Kentucky to authorize the application of the increased interstate basic coach fare of 2.2 cents, with corresponding adjustments for pullmans, to all intrastate fares, this present proceeding was initiated by the carriers to secure the Commission order of May 8, 1944, here involved, which requires the application of a basis no lower than their present interstate basis to intrastate fares, notwithstanding the refusal of the state rate authorities to authorize a similar application. The commissions of the respective states, and the Price Administrator for himself and the Director of Economic Stabilization intervened.

The foregoing references make plain that beginning with the comprehensive investigation of passenger fares, which was instituted by Commission order of June 4, 1934, and resulted in the order of February 28, 1936, 214 I. C. C. 174, the state regulatory authorities have not only been advised of the rate proceedings but have participated in

---

in said order to a basic coach fare of 2 cents per mile on the lines of said petitioners, subject to the rule for the disposition of fractions as modified by order of July 6, 1942, in said proceeding, and that in all other respects said order of January 21, 1942, shall remain in full force and effect."

[5] The portion of the order referred to reads as follows:

"*It appearing* . . . that the proper authorities of all States have been notified of this proceeding, and similar application has been or will be made to the regulatory authority of the respective States for permission to increase similarly petitioners' intrastate rates, fares, and charges;

. . . . .

"*It is ordered*, That the increased passenger fares as proposed by the said petitioners be, and they are hereby, approved . . ."

them. The record specifically shows this participation except in the supplementary proceeding under docket No. 26550, which was filed July 14, 1942, and resulted in the order of August 1, 1942, in docket *Ex parte No. 148.* This August 1, 1942, order, note 4 *supra,* permitted increasing the carriers' interstate fares of 1.65 cents per passenger mile (the 1.50 cents of the 1936 experimental southern district fares, then adjudged by the Commission to be "not unreasonable or otherwise unlawful," 214 I. C. C. 257, par. 3, and the ten per cent increase thereon of *Ex parte No. 148,* 248 I. C. C. 545, 564–66) to 2.2 cents. There was no occasion or requirement for hearing or report by the Commission or notice to the states of the petition of the southern passenger association carriers for permission to apply this 2.2 cents basic passenger rate to their interstate traffic.

The southern railroad passenger rate problem was stated in the terms of "what reasonable fare basis will meet with the greatest revenue response from the public?" 214 I. C. C. at 201. The conclusion of the Commission is thus summarized at page 255, finding of fact No. 11:

"Giving appropriate consideration to all of the evident circumstances and conditions which are likely to affect the ultimate revenue result to respondents, a maximum-fare basis, one way and round trip, for general application, of 2 cents per mile in coaches and 3 cents per mile in pullmans would be most likely to lessen the transportation burden of respondents and to harmonize with present-day economic conditions, with consequent fuller assurance to the respondents of realizing a fair return upon their property investment. There is doubt whether at least in the southern district a coach fare of 1.5 cents per mile is not producing better revenue results for those respondents than would any higher fare, and it may also be that round-trip fares on both coach and pullman traffic at a lower rate per mile than the one-way fares herein pre-

scribed would bring to respondents better revenue results than the higher fares. These matters are left to the discretion of respondents."

This resulted in the following provision by the Commission, at page 257:

"3. The present experimental fares in the southern and western districts and on the Norfolk & Western are not unreasonable or otherwise unlawful."

Obviously this provision was to make clear that the current lower rates of the southern carriers were not disapproved. It cannot properly be read, even though entirely isolated from its context, as a requirement that the southern carriers should continue to apply this lower basis to their passenger fares. The preceding provision limited the regular passenger fare structure of all railroads, including of course the southern carriers now appellees, to a maximum of 2 cents per passenger mile in coaches, without prejudice to lower fares. Lower fares were "discretionary" with the company. The accompanying order limited maximum interstate fares generally to 2 cents and contained no reference to the lower experimental fares. Thus a national interstate basis schedule, universally applicable,[6] was established by the report and order in docket No. 26550, the *Passenger Fares and Surcharges* decision, and this basis was increased to 2.2 cents per mile by the January 21, 1942, order in *Ex parte No. 148,* 248 I. C. C. 545. Consequently when the southern carriers, appellees here, petitioned on July 14, 1942, seeking a modification to permit the publication of interstate passenger tariffs in conformity with the previous conclusions in No. 26550 and *Ex parte No. 148,* no further investigation, report or notice to anyone was needed.

The interstate basis had been fixed at 2.2 cents a few months before. Carriers and states alike had acquiesced. The carriers now wished to exercise the discretion to raise

---

[6] There were certain specified exceptions. 214 I. C. C. at 244.

fares, which discretion had been reserved to them in No. 26550, 214 I. C. C. at 255, and subsequent conclusions 2 and 3, at 256. All that was necessary was to modify the order in *Ex parte No. 148* of January 21, 1942, which had approved, "as proposed," a requested ten per cent increase in fares "as published in passenger tariffs," 248 I. C. C. 550, 565, and the order, note 5 *supra,* so that the limitation "as published in passenger tariffs" would be removed. The appellee carriers had outstanding published tariffs of 1.50 cents when the January 21, 1942, order was entered. The August 1, 1942 order removed the limitation. See note 4 *supra.*

The preceding paragraphs under "Basic Interstate Fares" demonstrate, we think, that no further hearings or findings by the Commission were necessary to enable the Commission to authorize the application of the national basis of 2.2 cents to their interstate fares by the appellee carriers, instead of the 1.65 cents in effect prior to the order of August 1, 1942.

*Discrimination Against Interstate Commerce.* The Court holds, however, that even if it is assumed that the order permitting the interstate basic fare of 2.2 cents is valid, it does not follow that the intrastate passenger traffic earnings on the 1.65 cent rate are not contributing a fair proportion of the required total earnings of the road. The Court points to evidence from which the Commission might have found that the 1.65 cent basis, or a lower basis than 2.2 cents, would produce sufficient to meet the intrastate contribution. Evidence is set out in the Court's opinion showing greatly increased passenger earnings. The Court concludes that as such evidence is presented in this record, the Commission must make finding that no lower fare will produce intrastate traffic's proportion of revenue before requiring the application of the interstate 2.2 cent rate to intrastate fares.

This argument, we think, flows from another phase of the same misconception to which we earlier referred as

the source of the Court's erroneous conclusion. These proceedings ought not to be treated as isolated efforts to secure higher intrastate rates because the present intrastate rates are not producing their fair share of the total required income. To the Court's requirement, which it reads into §§ 13 (4) and 15a, of a specific finding on the issue of whether the present 1.65 cent intrastate rate produces now the proper intrastate proportion of revenue, there seems to us a conclusive answer. The interstate maximum was adopted by the Commission on the assumption that the intrastate rates would be adjusted to the same level. Therefore revenue from intrastate rates at the interstate fares is required to produce the needed income.

In this present proceeding the validity of the interstate rate of these carrier appellees was re-examined.[7] Evidence as to each appellee carrier of former deficits from its entire passenger traffic prior to 1942 was noted. Evidence as to their passenger operating ratios, their increased expenses, their net earnings on passenger business and other operations also, was received and appraised. Attention was called, 258 I. C. C. 142, to the fact that the previous investigation into passenger rates, *Ex parte No. 148,* had anticipated the earnings during war years, page 142, and their need for deferred maintenance and war service, page 148. The interstate basic rate was found just and reasonable. See *Alabama Intrastate Fares,* 258 I. C. C. 133, 137.

The figures used were aggregate figures for past passenger receipts and expenses. Audits for representative periods showed the estimated amount of additional

---

[7] The national investigation, *Ex parte No. 148,* has also been reopened and reexamined as late as December 12, 1944, but the passenger rates were left unchanged. 259 I. C. C. 159. This report discussed intermediate reexaminations of the national passenger rate structure.

revenue from the increased intrastate fares.[8] The statistics for the net railway operating income were introduced which covered all receipts and expenses. The evidence of train service in the respective states led the Commission to find that travel conditions were "substantially similar," 258 I. C. C. 154. If the Commission's conclusion as to carrier revenue needs assumed equal intrastate and interstate fares and if the present interstate rates were held "just and reasonable," it follows that the finding that the lower intrastate rates were not contributing their fair share of the "revenues required to enable respondents to render adequate and efficient transportation service" was proper. This logically led to the finding 6, that this failure of intrastate traffic to contribute its part discriminated against interstate commerce.

The determination of the necessary basic interstate rate in all these proceedings was made on the supposition of intrastate rates of equal level. When general basic rates, fares or charges are fixed by the Commission, the Commission necessarily gives consideration "to the need of revenues sufficient to enable the carriers, under honest, economical, and efficient management to provide" railway transportation at the lowest cost. § 15a. Therefore when interstate rates are fixed with the supposition of an equal level for intrastate rates, for substantially similar service, it requires a contribution on that basis from intrastate rates to avoid intrastate discrimination against interstate traffic. If it appears that interstate fares have been fixed with the supposition of an equal level for intrastate

---

[8] *Alabama Intrastate Fares,* 258 I. C. C. 133, 154–55, Finding 5:

"Respondents' revenues under the lower intrastate fares are less by at least $725,000 per annum in Alabama, $500,000 in Kentucky, $525,000 in North Carolina, and $525,000 in Tennessee than they would be if those fares were increased to the level of the corresponding interstate fares, and traffic moving under these lower intrastate fares is not contributing its fair share of the revenues required to enable respondents to render adequate and efficient transportation service."

fares, then it is clear that intrastate rates are not producing their expected revenue. The Commission thus would have manifested its consideration of the statutory requirements of §§ 13 (4) and 15a that due consideration be given revenue and efficient management in finding unjust discrimination against interstate commerce and in prescribing the intrastate rate which would remove the discrimination. See *United States* v. *Carolina Carriers Corp.*, 315 U. S. 475, 489.

In the proceeding in which these southern interstate carriers were permitted to apply the general basic interstate coach rate of 2.2 cents, the order therein of August 1, 1942, by adopting the order of January 21, 1942, in *Ex parte No. 148,* 248 I. C. C. 545, required the appellee carriers to make application to the state authorities for similar intrastate increases. See note 5, *supra.* The required applications led directly to this litigation.

Both in *Passenger Fares and Surcharges,* 214 I. C. C. 174, 257, par. 5, and *Increased Railway Rates, Ex parte No. 148,* 248 I. C. C. 545, 565–66, which are the two investigations which brought interstate coach fares to a maximum of 2.2 cents per passenger mile, the Commission itself ordered the numerous intrastate fares which were under its direction because regulated by the Commission through previous § 13 proceedings, modified in accordance with the interstate fares. As pointed out in the preceding paragraph the order in *Ex parte No. 148* required application to state rate regulatory bodies for authority to increase the intrastate passenger rates to the same level. Specific consideration was given to various objections raised by state commissions to the proposed new fares and rates, all with an eye to securing future compliance by the states with the interstate rates to be set by the Commission. See 248 I. C. C. at 560, 565, 574, 580, 582. In the *Passenger Fares* investigation, the figures on passenger traffic reflect the aggregate use of trains without consideration of a division of the traffic between inter- and intrastate. 214

I. C. C. 174, 176, 179, 180, 185, 200, 209, 221, 230, 231. The Commission said at page 187:

"At the time the 1920 increase was authorized many of the States prohibited passenger fares above certain amounts per mile, most of them 2 cents or 2.5 cents, and section 13 orders by us became necessary in order to bring the intrastate fares in those States up to the interstate basis."

The tables of passenger statistics in the appendices do not separate the traffic. Revenue from all passenger traffic was the dominant motive. See "Fact Findings," page 253. Evidence in *Ex parte No. 148* likewise related to aggregate revenue. So did the expected increases.

"On the basis of traffic, both interstate and intrastate, moved during 1941 and moving when the petition was filed, allowing for readjustments required by commercial and traffic conditions, petitioners estimate that the proposals will yield increased revenue for all class I railroads of about $356,956,000 per year." 248 I. C. C. 552.

The interstate increase of *Ex parte No. 148* "became effective on intrastate traffic in all of the States" by state order. 258 I. C. C. at 136. The general considerations on the decline in railroad passenger traffic which motivated the Commission in establishing the new interstate rate applied to both intrastate and interstate traffic. 214 I. C. C. at 176; 248 I. C. C. at 551. As a matter of fact, separation of interstate and intrastate income is not required by the Commission in its annual reports. 49 C. F. R. § 120.11 *et seq.* These proceedings convince us that the Commission reached its conclusion as to the proper interstate rate with the understanding that the interstate rate would be applied to intrastate traffic and that such revenue as might result from that application was needed by the carriers involved to furnish adequate service.

Under § 13 (4) of the Interstate Commerce Act in proceedings as to unjust discrimination against interstate commerce, the issue is not the earnings from intrastate

traffic but the appropriate proportion of those earnings as compared with earnings from interstate commerce. Section 15a requires consideration of costs, economy and adequate transportation service. Section 13 (4) requires a finding of discrimination against interstate commerce as a basis for regulation of intrastate commerce, 258 I. C. C. 154–55, pars. 5 and 6. It may be that the earnings from intrastate commerce may sometimes be one percentage of aggregate earnings and at another time another percentage. The Commission may conclude .that the carriers' required revenue may best be obtained from intrastate passenger fares rather than from freight rates. The reverse was once true. Cf. 214 I. C. C. at 227. These are matters for Commission decision.

The language of 15a has been modified from its original form in the Transportation Act of 1920 so that it no longer specifically empowers the Commission to deal with fares and rates of carriers as a whole for the nation or as a whole in designated territories or rate groups. We think, however, that the present statute, "In the exercise of its power to prescribe just and reasonable rates," the Commission shall give consideration to various named factors, is adequate to permit general rate regulation under 15a and § 1 (5). This power has been unquestioned. See *Passenger Fares and Surcharges,* 214 I. C. C. 174, and Class Rate Investigation No. 28300 and Consolidated Freight Classification No. 28310. It is the only practicable approach to the problem. See discussion in *New England Divisions·Case,* 261 U. S. 184, 196. We cannot treat the present proceeding as disassociated from the general investigation into passenger fares. *United States* v. *Louisiana,* 290 U. S. 70, 76–79. We think it is adequately shown that the orders in the general investigation were predicated upon the assumption that intrastate passenger traffic would have an equal basis with interstate traffic for fares.

*Unjust or Unreasonable Intrastate Fares.* It may be that the intrastate fares prescribed by the Commission are unjust or unreasonable in certain items. The report of the Commission provides a remedy for such a situation:

"The foregoing findings are without prejudice to the right of the authorities of the affected States, or of any interested party, to apply for modification thereof as to any specific intrastate fare on the ground that such fare is not related to interstate fares in such a way as to contravene the provisions of the Interstate Commerce Act." 258 I. C. C. at p. 155.

The remedy for a readjustment of the basic interstate fare or for a separation of the levels of interstate and intrastate fares is by application to the Commission for reopening of *Passenger Fares and Surcharges,* 214 I. C. C. 174.

We do not consider the other points which are raised by the appeal.

The CHIEF JUSTICE, MR. JUSTICE ROBERTS and MR. JUSTICE FRANKFURTER join in this dissent.