CITY OF YONKERS ET AL. *v.* UNITED STATES ET AL.

No. 109.   Argued December 13, 14, 1943.—Decided January 3, 1944.

*Mr. John J. Broderick,* with whom *Mr. Leonard G. McAneny* was on the brief, for the City of Yonkers; and *Mr. Horace M. Gray* for John W. Tooley, Jr.,—appellants.

*Mr. J. Stanley Payne,* with whom *Solicitor General Fahy* and *Messrs. Walter J. Cummings, Jr.* and *Daniel W. Knowlton* were on the brief, for the United States et al.; and *Mr. Harold H. McLean,* with whom *Mr. Thomas P. Healy* was on the brief, for the New York Central Railroad Co.,—appellees.

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

The Interstate Commerce Act confers upon the Interstate Commerce Commission authority to issue certificates

of public convenience and necessity allowing any carrier subject to the Act to abandon "all or any portion" of its line of railroad. § 1 (18), (19), (20), 49 U. S. C. § 1 (18), (19), (20), 24 Stat. 379, 41 Stat. 477–478. But the Act also provides that that authority of the Commission "shall not extend" to the abandonment "of street, suburban, or interurban electric railways, which are not operated as a part or parts of a general steam railroad system of transportation." § 1 (22), 49 U. S. C. § 1 (22).

The New York Central Railroad Co. filed an application with the Commission for a certificate under § 1 (18)–(20) of the Act authorizing it to abandon an electric branch line extending 3.1 miles from Van Cortlandt Park Junction, New York City, to Getty Square, Yonkers, New York. This line was constructed in 1888 by a predecessor company for the purpose of developing suburban business between Yonkers and New York City. The line was electrified in 1926 with the hope that the surburban business would increase. It is now a physical part of the New York Central's Putnam Division with which it connects at Van Cortlandt Park Junction. The Putnam Division in turn connects with the Hudson Division which is part of the main line of the New York Central from New York City to Chicago. The Hudson Division follows the east bank of the Hudson River through Yonkers to Albany. The Putnam Division extends north from Sedgwick Avenue and West 161st Street, New York City, through Yonkers to Brewster, New York. The Putnam Division lies east of, and is roughly parallel with, the Hudson Division. In the City of Yonkers the two divisions are about a mile apart. The electric line in question is between the Hudson and Putnam Divisions. Getty Square, its terminal in Yonkers, is .3 mile east of the Yonkers station on the Hudson Division. The New York Central system is for the most part operated by steam. Some portions of its lines are electrified, including the Hudson Division be-

tween New York City and Harmon, New York, and Harlem Division so far as White Plains, New York, the Putnam Division between Sedgwick Avenue and Van Cortlandt Park Junction, and the Yonkers line in question. With the exception noted, no part of the Putnam Division is electrified, its trains being operated by steam.

This Yonkers electric branch handles no freight, mail, express, or milk traffic and no industries are dependent on it for such service. Its traffic is exclusively passenger traffic, principally commuter travel between Getty Square and three other stations in Yonkers and Grand Central Station in New York City. The trains serving stations on this Yonkers electric branch do not go through to Grand Central Station on account of the congested condition of the main-line tracks funnelling into Grand Central Station. Accordingly, these trains run only from Getty Square to Van Cortlandt Park Junction and thence over the main line of the Putnam Division to the terminal at Sedgwick Avenue. Passengers from Yonkers to Grand Central Station must transfer to Hudson Division trains at either High Bridge or University Heights stations which are north of the Sedgwick Avenue Station. Tariffs of the New York Central provide for one-way, monthly-commutation, and other tickets usable between the stations in Yonkers and Grand Central Station. Time tables of the New York Central disclose the service on this electric branch. And its operating results are reflected in the accounts of the New York Central.

The trains running on this electric branch are composed of two, three or four cars. The trains are hauled not by a locomotive but by so-called multiple unit cars. The structure of the line is such that locomotives cannot be used on it. The trains on this electric branch proceed only to Getty Square, Yonkers, and not beyond.

The Commission though adverting to a number of the facts which we have mentioned did not address itself to

the question whether this electric branch line was or was not "operated as a part or parts of a general steam railroad system of transportation" within the meaning of § 1 (22). The Commission did not undertake to review the evidence relevant to that issue. It made no findings respecting it. It authorized the abandonment on the grounds that continued operation would impose "an undue and unnecessary burden" upon the New York Central and upon interstate commerce.[1] The Commission says that the question of its jurisdiction under § 1 (22) was neither presented *in limine* nor urged in the briefs, in the exceptions to the examiner's report, or in the oral arguments. It was, however, presented in petitions for reconsideration which the Commission denied without opinion.

This suit to enjoin the order of the Commission, brought before a District Court of three judges (38 Stat. 219, 220, 28 U. S. C. § 47) was initiated by the Public Service Commission of New York, the City of Yonkers, and a committee of Yonkers commuters.[2] The jurisdiction of the Commission was challenged before the District Court. And that objection which was overruled there (50 F. Supp. 497) has been renewed on the appeal which brings the case here. 28 U. S. C. § 47a, § 345.

The District Court in sustaining the order of the Commission, reviewed the evidence and concluded that the operation of this electric branch was "intertwined with the operation of the system as a whole." It relied especially on the fact that the bulk of the traffic on this electric branch transfers at High Bridge or University Heights

---

[1] The certificate authorizes a complete abandonment of the Yonkers branch, including dismantlement and salvaging.

[2] The Public Service Commission of New York, which took the lead in attacking the order of the Commission before the District Court but which has not appeared here, asserted in its complaint that authority to discontinue the four stations was required by New York law but had not been sought or obtained.

to the Hudson Division and that those transfers made it necessary for the New York Central to provide seats on the Hudson Division trains for all the transferred Yonkers passengers for the remaining short run to Grand Central Station.

The Commission itself has noted that in the "construction of these exclusion clauses great difficulty has been experienced, particularly in determining the roads properly classifiable as interurban electric railways." Annual Report (1928), p. 80. That difficulty is apparent here by the division of opinion which exists in the Court whether this Yonkers branch is an "interurban electric" railway which is "operated as a part" of the New York Central system.[3] § 1 (22). As stated by Mr. Justice Brandeis in *United States* v. *Idaho,* 298 U. S. 105, 109, the determination of what is included within the exemption of § 1 (22) involves a "mixed question of fact and law." Congress has not left that question exclusively to administrative determination; it has given the courts the final say. *Id.,* p. 109. It is settled that the aid of the Commission need not be sought before the jurisdiction of a court is invoked to enjoin violations of the provisions in question. *Texas & Pacific Ry. Co.* v. *Gulf, C. & S. F. Ry. Co.,* 270 U. S. 266. And the fact that the Commission fails to make a finding on this jurisdictional question obviously does not preclude the reviewing court from making that determination initially. But we deem it essential in cases involving a review of orders of the Commission for the courts to decline to make that determination without the basic jurisdictional findings first having been made by the Commission.

---

[3] Cf. *Piedmont & Northern R. Co.* v. *Interstate Commerce Commission,* 286 U. S. 299, 307, and *United States* v. *Chicago North Shore & M. R. Co.,* 288 U. S. 1, 9–12, which emphasize in determining the status of independent electric roads the dominance of interurban passenger service and the preponderance of local traffic.

The power of the Commission to control the abandonment of intrastate branches of interstate carriers stems from the power of Congress to protect interstate commerce from undue burdens or discriminations. *Colorado* v. *United States,* 271 U. S. 153; *Transit Commission* v. *United States,* 284 U. S. 360; *Purcell* v. *United States,* 315 U. S. 381. And see *United States* v. *Hubbard,* 266 U. S. 474, for an application of the doctrine of the *Shreveport* case (*Houston, E. & W. T. R. Co.* v. *United States,* 234 U. S. 342) to the intrastate rates of interurban electric railroads. The exemptions contained in § 1 (22) do not necessarily reflect the lack of constitutional power to deal with the excepted phases of railroad enterprise. Underlying § 1 (22) is a Congressional policy of reserving exclusively to the States control over that group of essentially local activities. See H. Rep. No. 456, 66th Cong., 1st Sess., p. 18. We recently stated that the extension of federal control into these traditional local domains is a "delicate exercise of legislative policy in achieving a wise accommodation between the needs of central control and the lively maintenance of local institutions." *Palmer* v. *Massachusetts,* 308 U. S. 79, 84. In the application of the doctrine of the *Shreveport* case, this Court has required the Commission to show meticulous respect for the interests of the States. It has insisted on a "suitable regard to the principle that whenever the federal power is exerted within what would otherwise be the domain of state power, the justification of the exercise of the federal power must clearly appear." *Florida* v. *United States,* 282 U. S. 194, 211–212. In that case this Court set aside an intrastate rate order of the Commission because of the "lack of the basic or essential findings required to support the Commission's order." *Id.,* p. 215. The principle of the *Florida* case is applicable here. The question is not merely one of elaborating the grounds of decision and bringing into focus what is vague and obscure. See *United States*

v. *Chicago, M., St. P. & P. R. Co.*, 294 U. S. 499. Cf.
*Securities & Exchange Commission* v. *Chenery Corp.*, 318
U. S. 80. Here as in the *Florida* case the problem is
whether the courts should supply the requisite jurisdic-
tional findings which the Commission did not make and
to which it even failed to make any reference.[4]

Congress has withheld from the Commission any power
to authorize abandonment of certain types of railroad
lines. It is hardly enough to say that the Commission's
orders may be set aside by the courts where the Commis-
sion exceeds its authority. The Commission has a special
competence to deal with the transportation problems
which are reflected in these questions. The Congress has
entrusted to the Commission the initial responsibility for
determining through application of the statutory stand-
ards the appropriate line between the federal and state
domains. Proper regard for the rightful concern of local
interests in the management of local transportation facili-
ties makes desirable the requirement that federal power
be exercised only where the statutory authority affirma-
tively appears. The sacrifice of these legitimate local
interests may be as readily achieved through the Commis-
sion's oversight or neglect (*Illinois Commerce Commission*
v. *Thomson*, 318 U. S. 675) as by improper findings. The
insistence that the Commission make these jurisdictional

---

[4] For cases dealing with the exception of suburban or interurban
electric railways where the Commission has passed on the jurisdictional
question see In the Matter of Michigan United Rys. Co., 67 I. C. C.
452; Abandonment of Line by Boise Valley Traction Co., 79 I. C. C.
167; Proposed Abandonment by Lewiston & Youngstown Frontier
Ry. Co., 124 I. C. C. 219; Proposed Construction by Piedmont &
Northern Ry. Co., 138 I. C. C. 363, 372; Unified Operation at Los
Angeles Harbor, 150 I. C. C. 649, 661; Glendale & Montrose Ry. Pro-
posed Abandonment, 166 I. C. C. 625.

The requisite finding was made by the Commission in the Oregon
Short Line case (193 I. C. C. 697, 705) in which the order of the
Commission was set aside by *United States* v. *Idaho, supra.*

findings before it undertakes to act not only gives added assurance that the local interests for which Congress expressed its solicitude will be safeguarded. It also gives to the reviewing courts the assistance of an expert judgment on a knotty phase of a technical subject.

We are asked to presume that the Commission, knowing the limit of its authority, considered this jurisdictional question and decided to act because of its conviction that this branch line was not exempt by reason of § 1 (22). But that is to deal too cavalierly with the Congressional mandate and with the local interests which are pressing for recognition. Where a federal agency is authorized to invoke an overriding federal power except in certain prescribed situations and then to leave the problem to traditional state control, the existence of federal authority to act should appear affirmatively and not rest on inference alone.

This is not to insist on formalities and to burden the administrative process with ritualistic requirements. It entails a matter of great substance. It requires the Commission to heed the mandates of the Act and to make the expert determinations which are conditions precedent to its authority to act.

We intimate no opinion on the merits of the controversy. For in absence of the requisite jurisdictional findings we think the order of the Commission should have been set aside.

*Reversed.*

Mr. Justice Frankfurter, dissenting:

Congress has empowered the Interstate Commerce Commission to authorize a railroad, when public convenience permits, to abandon any portion of its line. But when such portion is a suburban or interurban electric railway, abandonment may be authorized only if it is part of a general steam railroad system of transportation.

§ 1 (18) and (22) of the Interstate Commerce Act, as amended, 49 U. S. C. § 1 (18) and (22). This Court has held that whether such a line is of a character to permit abandonment under federal authority need not be determined in the first instance by the Interstate Commerce Commission; and such determination when made does not foreclose an independent judicial judgment. *Texas & Pacific Ry. Co.* v. *Gulf, C. & S. F. Ry. Co.*, 270 U. S. 266, and *United States* v. *Idaho*, 298 U. S. 105. On such an independent examination of the issue the court below had no doubt that the Yonkers branch of the New York Central, the portion of the Central lines for which abandonment was here sought, was not "a suburban or interurban line unconnected with the rest of the Central's railroad system" but was in fact "intertwined with the operation of the [New York Central Railroad] system as a whole." 50 F. Supp. 497, 498. The record amply sustains this conclusion. If this Court, however, on its own estimate of the various elements in the financial, physical and transportation relations between the rest of the New York Central lines and this Yonkers branch, had struck a contrary balance and found that the Yonkers branch was not operated as a part of the general New York Central system, I should not have deemed the matter of sufficient importance to warrant expression of dissent.

But the Court does not decide on the merits. In effect, it remits the controversy to the Interstate Commerce Commission on the ground that the Commission did not make a formal finding, described as "jurisdictional," that the Yonkers branch was in fact "operated as a part . . . of a general steam railroad system of transportation." The Commission may very well now formally make such a finding of a connection between the Yonkers branch and the New York Central, which in fact is writ large in the Commission's report in granting the application for abandonment, and the weary round of litigation may be re-

peated to the futile end of having this Court then, forsooth, express an opinion on the merits opposed to that of the Commission and the District Court. This danger if not likelihood of thus marching the king's men up the hill and then marching them down again seems to me a mode of judicial administration to which I cannot yield concurrence. I think the case should be disposed of on the merits by affirming the judgment of the District Court.

This seems to me all the more called for since I find no defect in the foundation of the Commission's order. No doubt the Interstate Commerce Commission like other administrative agencies should keep within legal bounds and courts should keep them there, in so far as Congress has entrusted them with judicial review over administrative acts. Of course when a statute makes indispensable "an express finding," an express finding is imperative, see *Wichita Railroad & Light Co.* v. *Public Utilities Comm'n*, 260 U. S. 48, 59. But the history of the Interstate Commerce Act and its amendments illumine the different legal functions expressed by the term findings. When Congress exacts from the Commission formal findings there is an end to the matter. For certain duties of the Commission and at certain stages in the history of the Interstate Commerce Act, Congress did require formal findings, but experience led Congress later to dispense with such formal requirements. See *Manufacturers Ry. Co.* v. *United States*, 246 U. S. 457, 489–90. But courts have also spoken of the need of findings as the basis of validity of an order by the Interstate Commerce Commission in the absence of a Congressional direction for findings. The requirement of findings in such a context is merely part of the need for courts to know what it is that the Commission has really determined in order that they may know what to review. "We must know what a decision means before the duty becomes ours to say whether it is right or

wrong." See *United States* v. *Chicago, M., St. P. & P. R. Co.*, 294 U. S. 499, 509–511.

This is the real ground for the decisions which have found Interstate Commerce Commission orders wanting in necessary findings. They have all been cases where the determination of an issue is not open to independent judgment by this Court, and where the case as it came here rested on conflicting inferences of fact left unresolved by the Commission. Such were the circumstances, for instance, in *Florida* v. *United States*, 282 U. S. 194, particularly at 214–215, and *United States* v. *Baltimore & Ohio R. Co.*, 293 U. S. 454, 455, particularly at 463–464. Findings in this sense is a way of describing the duty of the Commission to decide issues actually in controversy before it. Analysis is not furthered by speaking of such findings as "jurisdictional" and not even when—to adapt a famous phrase—jurisdictional is softened by a *quasi*. "Jurisdiction" competes with "right" as one of the most deceptive of legal pitfalls. The opinions in *Crowell* v. *Benson*, 285 U. S. 22, and the casuistries to which they have given rise bear unedifying testimony of the morass into which one is led in working out problems of judicial review over administrative decisions by loose talk about jurisdiction.

The nub of the matter regarding the requirement of findings, where the formal making of them is not legislatively commanded, is indicated in *United States* v. *Louisiana*, 290 U. S. 70. Reviewing the validity of the Commission's order is the serious business of sitting in judgment upon a tribunal of great traditions and large responsibility. An order of the Commission should not be viewed in a hypercritical spirit nor even as though *elegantia juris* were our concern. We should judge a challenged order of the Commission by "the report, read as a whole," 290 U. S. *supra* at 80, and by the record as a whole out of which the report arose.

Viewing its order in this light makes plain enough why the Commission never formally stated that the line which it authorized to be abandoned was in fact operated as part of the New York Central system. It never formally made this statement because it was never questioned before it. On the face of the application, in the report proposed by the Commissioner's examiner, and in the report of the Commission, by Division 4, authorizing the issuance of a certificate of abandonment, the facts showing that the Yonkers branch was a part of the operating system of the New York Central are set forth in detail. Extensive exceptions were taken to the examiner's report by the City of Yonkers and a committee of Yonkers commuters but not even remotely did they take the point which is now made the ground for invalidating the Commission's order. Elaborate petitions for rehearing were filed by the protestants, including the Public Service Commission of New York, as the guardian of the local interests of New York,[1] but not one of these petitions raised the objection now raised. The jurisdiction of the Commission was questioned, but no claim was made that the Yonkers branch was not an operating part of the New York Central. The City of Yonkers enumerated four grounds in challenging

---

[1] Due concern for local interests in the administration of the Interstate Commerce Act hardly calls for an exaggerated concern for formal findings. The Interstate Commerce Act relies primarily on state authorities for the safeguarding of local interests. It is therefore relevant to note that the New York Public Service Commission, which is charged with the duty of protecting the local interests of New York against federal encroachments and which does not appear to have been unalert in doing so, has acquiesced in the decision below and is not here urging the local interest on which the decision of this Court seems to be based. That the state agency had best be looked to for the vindication of conflicting local interests within a state is well illustrated by the fact that while the City of Yonkers protested against the abandonment of the branch line, the City of New York urged it.

the jurisdiction of the Commission, but it did not specify the one now taken by the Court. The committee of commuters rested their claim of want of jurisdiction on the specific grounds that "(1) the line sought to be abandoned is an interurban electric passenger railway located wholly within the State of New York and (2) . . . the alleged annual operating deficit" of the Yonkers branch was too insignificant to burden the operation of the New York Central. Exercising the discretion which Congress explicitly conferred upon it, the full Commission denied the petition for rehearing. Interstate Commerce Act, § 17 (6). In any fair construction of the action of the Commission such a denial is an adverse finding of such claims as were made in the petitions for rehearing. The crucial fact is that only when the present bill was filed in the court below did the objection which the Court now sustains emerge in the specific claim that the Yonkers "branch is not operated as a part or parts of a general steam railroad system of transportation."

Can there be any doubt that this contention was not put to the Commission because it was an afterthought? This issue was never tendered to the Commission because the facts which deny it were never questioned in the proceedings conducted before it with vigor and ability by several protestants during the three successive stages that preceded a challenge in the courts.

The case is now sent back to the Commission. The facts regarding the relation of the Yonkers branch to the New York Central are spread at large upon the record and are not in controversy. In view of the three proceedings before the Commission it is reasonable to assume that the Commission will add to its report the formal finding now requested of it. If the case then returns here I find it too hard to believe that this Court would reject the conclusion of the Commission and of the lower court that the Yonkers branch is an operating part of the New York Central

within § 1 (22). Is not insistence on such an empty formalism a reversion to seventeenth century pleading which required talismanic phrases, as for instance that a seller could not be held to warrant that he sold what he purported to sell unless the buyer pleaded *warrantizando vendidit* or *barganizasset?* On the other hand, if the Court with all the facts before it does not think the Yonkers branch is a part of the railway operations of the New York Central, now is the time to say so.

MR. JUSTICE REED and MR. JUSTICE JACKSON join in this opinion.

