W. L. DOBBS, Mayor and City of Covington, Georgia, Plaintiffs-Appellees,

v.

Honorable Douglas M. COSTLE, Administrator, et al., Defendants-Appellants.

No. 75–4444.

United States Court of Appeals,
Fifth Circuit.

Sept. 21, 1977.

John W. Stokes, Jr., U. S. Atty., William D. Mallard, Jr., Asst. U. S. Atty., Atlanta, Ga., Edmund B. Clark, Chief, App. Sect., Land & Natural Resources Div., Dept. of Justice, Washington, D. C., Peter R. Taft, Asst. Atty. Gen., Maryann Walsh, Atty., Dept. of Justice, Robert V. Zener, Gen. Counsel, Joseph M. Zorc, Atty., Envir. Prot. Agency, Washington, D. C., for defendants-appellants.

W. Kent Campbell, Covington, Ga., Lloyd Sutter, Richard L. Stumm, Atlanta, Ga., for plaintiffs-appellees.

Before GOLDBERG and FAY, Circuit Judges, and DUMBAULD,* United States District Judge.

* Senior District Judge of the Western District of Pennsylvania sitting by designation.

DUMBAULD, Senior District Judge.

This is an appeal by defendant Environmental Protection Agency administrators from a summary judgment of the District Court for the Northern District of Georgia, Atlanta Division, dated October 24, 1975, against them in favor of a Georgia municipality which had constructed a sewage facility for which it claimed a federal subsidy under the terms of Section 206(a) of the Federal Water Pollution Control Act, as added in Title II thereof by the Federal Water Pollution Control Act Amendments of 1972, approved October 18, 1972, 86 Stat. 838, 33 U.S.C. § 1286(a). That section reads:

> Any publicly owned treatment works in a State on which *construction was initiated* after June 30, 1966, but before July 1, 1972, which was approved by the appropriate State water pollution control agency and which the Administrator finds meets the requirements of section 8 of this Act[1] in effect at the time of the *initiation of construction* shall be reimbursed a total amount equal to the difference between the amount of Federal financial assistance, if any, received under such section 8 for such project and 50 per centum of the cost of such project, or 55 per centum of the project cost where the Administrator also determines that such treatment works was constructed in conformity with a comprehensive metropolitan treatment plan as described in section 8(f) of the Federal Water Pollution Control Act as in effect immediately prior to the date of enactment of the Federal Water Pollution Control Act Amendments of 1972. Nothing in this subsection shall result in any such works receiving Federal grants from all sources in excess of 80 per centum of the cost of such project. (Italics supplied)

Section 212(1) of Title II provides a definition of the term "construction" as used in that Title:

> As used in this title—
>
> (1) The term "construction" means any one or more of the following: preliminary planning to determine the feasibility of treatment works, engineering, architectural, legal, fiscal, or economic investigations or studies, surveys, designs, plans, working drawings, specifications, procedures, or other necessary actions, erection, building, acquisition, alteration, remodeling, improvement, or extension of treatment works, or the inspection or supervision of any of the foregoing items.[2]

These statutory provisions are dispositive of the case at bar, which raises solely a question of law, there being no contest as to the operative facts. These are summarized as follows in the opinion of the District Court:

> The chronological order of events in regard to construction of the sewage treatment plant is not in dispute. Beginning in January, 1971, the City proposed a rate revision to provide funds for a bond issue for the sewer construction. The funds from the sale of the bonds were received on November 29, 1971. On March 12, 1971, an engineering contract was signed between the City and Walker & Associates to provide the design and specifications for the sewer construction. On March 16, 1971, a grant offer was made to the City by the EPA and accepted on April 5, 1971. On September 13, 1971, the soil testing and exploratory boring were completed by the Georgia Testing Laboratory. On December 16, 1971, the plans and specifications for the construction were submitted to the EPA for review.

1. Section 8 provided technological standards which had to be met in order to qualify for federal subsidy. In its original form it was Section 6 of the Water Pollution Control Act of June 30, 1948, 62 Stat. 1158–59. Subsequently amended by the Acts of July 9, 1956, 70 Stat. 502–503 [where the definition of "construction" first appeared as Section 6(e), at 70 Stat. 503]; July 20, 1961, 75 Stat. 204, 206–207; October 2, 1965, 79 Stat. 903, 906–907 [where Section 6 was redesignated as Section 8]; November 3, 1966, 80 Stat. 1249–50; and April 3, 1970, 84 Stat. 113–14. See 33 U.S.C.A. § 1158.

2. 86 Stat. 844. This definition originated in Section 6(e) as amended by the Act of July 9, 1956, 70 Stat. 503.

After several submissions and revisions, the EPA finally approved the plans and specifications for the sewage treatment plant on May 9, 1972. On May 23, 1972, advertisements for bids were submitted. On July 11, 1972, the bids were received and publicly opened for the treatment plant and outfall line. On July 17, 1972, the construction contracts were awarded subject to the approval of the EPA. On September 20, 1972, a work order was issued to Christopher Construction Co. to begin physical construction on the treatment plant and on October 2, 1972, a work order was issued to C. F. W. Construction Company to begin physical construction on the outfall line.

The final cost of construction for the Dried Indian Creek project was $1,374,-432.69. The EPA has agreed to pay the City of Covington thirty-three per cent (33%) of this amount. The amount here in controversy is $302,375.19, or twenty-two per cent (22%) of the foregoing construction cost, representing the difference between the amount EPA has agreed to reimburse the City and the fifty-five per cent (55%) amount to which the City believes it is entitled under Section 206 of the Act.[3]

Defendants rely upon an EPA regulation which defines "initiation of construction" as "the issuance to a construction contractor of a notice to proceed, or, if no such notice is required, the execution of a construction contract.[4]"

If the regulation were accepted as controlling, plaintiffs would obviously lose, for the date when actual physical construction began was after work orders were issued on September 20, 1972, and October 2, 1972, following contracts executed on July 17, 1972. These dates are all posterior to the cutoff date of July 1, 1972, prescribed in Section 206(a).

But if the broader definition of "construction" contained in the statute (which embraces and includes various preliminary steps as part of the defined concept) is accepted, plaintiffs win; for the summary of uncontested facts, as set forth in the extract from the District Court's opinion quoted above, clearly shows that many of the preliminary steps specified in the statutory definition were completed and consummated before July 1, 1972.

■ And we are persuaded that the District Court was correct in choosing to give effect to the statute rather than the regulation. The District Court reviewed and gave appropriate weight to cases enunciating the maxim that deference is due to a long-standing administrative construction of a statute,[5] but could not ignore the equally valid maxim that such deference is not to be accorded to an administrative construction which is plainly wrong, or contrary to the clear terms of the statute. *U. S. v. Calamaro,* 354 U.S. 351, 359, 77 S.Ct. 1138, 1 L.Ed.2d 1394 (1957); *Dixon v. U. S.,* 381 U.S. 68, 73–74, 85 S.Ct. 1301, 14 L.Ed.2d 223 (1965); *Espinoza v. Farah Mfg. Co.,* 414 U.S. 86, 94–95, 94 S.Ct. 334, 38 L.Ed.2d 287 (1973).

In case of conflict between regulation and statute, the simple rule laid down long ago by Chief Justice John Marshall is controlling: "that which is not supreme must yield to that which is supreme." *Brown v. Maryland,* 12 Wheat. 419, 448, 6 L.Ed. 678 (1827).

In Section 206(a) Congress is using language in its ordinary meaning. "Initiation of construction" is not a talismanic formula[6] or an exotic term of art. It sim-

---

**3.** Joint Appendix, 28–29.

**4.** 40 C.F.R. § 35.890, modeled on 40 C.F.R. 35.805–1, promulgated under the statute in effect before the 1972 amendments.

**5.** The utility of maxims in resolving questions of statutory construction is rather limited. The true criterion is the intention of the lawmaker as expressed in the words used under the par-

ticular circumstances of the enactment. There is no better technique than the "threefold imperative" prescribed by Justice Frankfurter: "(1) Read the statute; (2) read the statute; (3) read the statute!" Henry J. Friendly, *Benchmarks* (1967) 202.

**6.** See *City of Yonkers v. U. S.,* 320 U.S. 685, 698, 64 S.Ct. 327, 88 L.Ed. 400 (1944).

ply means the "beginning" or "commencement" of construction.[7] It is the *terminus a quo* from and after which the existence of construction is established.

When "construction" has "started" or "begun" or "commenced" or "been initiated," it is nothing other or different in its quality or nature than "construction" as defined in the definition of "construction" set forth in Section 212(1).[8]

As the District Court pointed out,[9] there is no difference in meaning between the word "construction" when used in the phrase "construction was initiated" at the outset of Section 206(a) and when used in the phrase "initiation of construction" further on in that Section. The meaning would be the same if the latter phrase were replaced by the words previously used, so that the wording of the latter passage would be "at the time when construction was initiated" instead of "at the time of the initiation of construction." For the statutory definition in Section 212(1) is by its terms applicable wherever the word "construction" is "used in this title." That means throughout the entire Title. Section 206(a) is included in Title II of the Act. It would be anomalous if the same word were used in two different meanings within a single sentence of Section 206(a); and if Congress had meant to employ such an extraordinary procedure it certainly would have given some clear indication of such an unusual intention.

Defendant's arguments have little persuasiveness as a matter of law, but really raise questions of policy, expediency, and convenience. It is urged that the statutory definition merely indicates what kinds of work can be included within the scope of a federally reimbursable project, but cannot be utilized to determine whether the project is eligible for reimbursement at all under the statutory time limits; that if reimbursement for preliminary steps were permitted, huge claims might be asserted for preliminary work on projects which never were pressed to completion, and thus diminish the funds available for completed projects; that it is easy to enumerate and monitor all reimbursable projects by uniformly using as a criterion the date when contracts were executed or work orders issued, since these are easily determinable and well-documented events, whereas the scope of inquiry would be broadened and rendered more indefinite if account had to be taken of all the preliminary steps specified in the statutory definition.

■ The matters dwelt on by defendants are doubtless important from an administrative or fiscal standpoint, but are not controlling insofar as interpretation of the statutory language is concerned. Administrative convenience cannot outweigh legal rights. *Goldberg v. Kelly,* 397 U.S. 254, 265–66, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). And it is for Congress to determine how much financial support is to be given to anti-pollution projects. If Congress chooses to finance preliminary planning or only completed works,[10] the decision rests with the legislative branch.

For a considerable period of time effectuation of federal anti-pollution policy was hampered by lack of adequate appropriations.[11] If Congress chooses to adopt a contrary course by authorizing over-generous grants to encourage effective action to remedy serious national environmental prob-

---

7. This interpretation is buttressed by the legislative history of the statute. The Conference Committee Report (No. 92–1236, see 2 U.S. Code Cong. & Admin.News, p. 3792) uses the word "started" in explaining Section 206(a): "the conference substitute provides that any publicly owned treatment works on which construction was *started* after June 30, 1966, but before July 1, 1972" etc. (Italics supplied).

8. Just as Land's End is the beginning of England to an approaching vessel but the initial portion of that "scepter'd isle" is no more and no less England than the Midlands or any other part of the country.

9. Joint Appendix, 36.

10. In any event, that question is not now before this Court. The Covington project is completed.

11. 2 U.S.Code Cong. & Admin.News, pp. 3672, 3698 (Senate Report No. 92–414).

lems, neither the courts nor the EPA should undertake to frustrate the legislative will. The arguments which defendants advance here would be more appropriate in another forum.

For the foregoing reasons the judgment of the District Court is affirmed.