702 P.2d 795

**INTERMOUNTAIN HEALTH CARE, INC., a nonprofit Utah corporation, dba Primary Children's Medical Center, Plaintiffs,**

**and**

**Rex L. Roper and Ann Marie Roper, husband and wife, and Nathan R. Roper, their minor son, Plaintiffs-Appellants,**

**v.**

**BOARD OF COUNTY COMMISSIONERS OF CARIBOU COUNTY, Idaho, Defendant-Respondent.**

**No. 15416.**

Supreme Court of Idaho.

June 17, 1985.

A. Bruce Larson, Soda Springs, for plaintiffs-appellants.

Clyde G. Nelson and Gary L. Spackman, Soda Springs, for defendant-respondent.

SHEPARD, Justice.

This case arises from a hospital's claim against Caribou County for care rendered to allegedly indigent residents of the county. The county settled its case with the hospital and now seeks reimbursement from the parents of the infant patient. The central issue presented involves the nature of the county's right to be reimbursed by the patient and the patient's parents.

Nathan Roper was born in Caribou County with a herniated diaphragm, for which he was sent first to Caribou Memorial Hospital, then to Bannock Memorial Hospital, and finally to Primary Children's Medical Center, a subsidiary of appellant Intermountain Health Care (IHC) in Salt Lake City, Utah. Nathan's medical bills amounted to $36,000. Neither the reasonableness of these charges nor the necessity of the care provided is at issue on this appeal. Nathan's parents, Rex and Ann Marie Roper, had no medical insurance. The Ropers applied for county aid to pay Nathan's medical costs.

The Caribou County commissioners initially denied the Ropers' application. IHC's counsel requested a hearing, which was held. The Ropers' testimony at that hearing revealed that Mrs. Roper had inherited an interest in a house in England, which interest had not been listed as an asset on the Ropers' request for county medical assistance. Mrs. Roper had a half-interest in the property, subject to the life tenancies of her uncle and his wife, whose ages were then 61 and 68 respectively, *i.e.*, Mrs. Roper had a remainder interest in the house and land. The affidavit of a British attorney, whose assistance was sought by IHC in this matter, stated that the present value of Mrs. Roper's remainder interest was between 1600 and 2000 English pounds sterling, which amount is not converted for us into American dollars. The England property itself was worth about $37,000 at the time of the hearings below; this sum was apparently significantly more than the value of the remainder interest.

The Ropers also disclosed at this commission hearing that they had a tentative interest in a five-acre parcel of land in Caribou County. Rex Roper had given the owner of the property $9,250 as purchase price, which money had also come from an inheritance received by Ann Marie Roper from a relative in England. The money had been paid to the seller of the Caribou County property in the form of a guaranteed check forwarded by Roper's bank to the seller's bank. The Ropers had received no deed or title insurance and were litigating the ownership of that property. The outlook on their success in that litigation seemed poor, there being encumbrances on the land.

The county commissioners denied the claim of medical indigency. IHC and the Ropers appealed from this denial to the district court, Judge Francis J. Rasmussen

presiding. The Ropers raised two issues, the first being whether a future interest in real property is an available resource, for purposes of determining medical indigence; and the second being whether the Ropers were, indeed, indigent.

IHC requested the court to allow augmentation of the record. IHC wished to offer as evidence the affidavits from the England attorney, which documents attested to the value of the property in England. This motion was granted by the court. The board of county commissioners objected to plaintiffs' being allowed to augment the record, on the bases that the district court's review was, by statute, confined to the record, and that, if such evidence was to be considered in determining the outcome of the case, then the board of county commissioners should be allowed to look at the documents first and to revise its findings accordingly.

The court found the assertion that the case should be resubmitted to the board to be valid, and the court remanded the case to the county commissioners on December 2, 1981, "to consider the evidence used in augmentation and to consider any other evidence they deem necessary to reconsider the matter." The board held further hearings on the Roper claims on February 8, April 12, and July 22, 1982.

In August 1982, counsel for IHC and the Ropers moved the district court to grant their parties extraordinary appellate relief. The appellants alleged that the county commissioners had not acted in a timely fashion upon the court's remand, had not made proper findings as ordered by the district court, and should either be restrained from proceeding further or be deemed to have constructively denied medical aid to appellants. Appellants requested the court to review the administrative record and grant them relief. Counsel for the county commissioners in turn moved the court to restrain Mrs. Roper from selling the England property. That motion was granted, and Mrs. Roper did restrain from selling her interest in the England property.

No formalized findings from the county commissioners were ever submitted to the district court. In lieu of such findings, the county submitted to the court an affidavit from the chairman of the Board of County Commissioners, Robert E. Anderson, reciting the foregoing procedure and that upon remand, the board had determined that the Ropers "did own or possess real property located in the country of England ... [in] which ... Ann Marie Roper has a reversionary interest to the extent of one-half of the value of said property, and did own real property located in Caribou County, Idaho, subject to encumbrance ... [and] certain other personal property;" that the commissioners did not feel the Ropers were actually indigent, but they felt that the court would find the Ropers medically indigent, so the board had agreed to settle the Roper claim with IHC for the principal amount of the claim; that the board understood that the Ropers were legally obligated to reimburse the county for the moneys paid to IHC on the Ropers' behalf; that the England property was potentially worth the total amount of the claim for Nathan's medical expenses; that the Caribou County property was worth $10,000 upon clearing of the liens; and that the board requested that the Ropers be required to convey their interest in such properties to the county.

The parties stipulated that IHC had been paid, and the court dismissed IHC from the case.

Judge Rasmussen issued a decision on May 26, 1983, "on the issue of the right of Caribou County to seek reimbursement from the indigent defendant, including a lien on future interests." The court first explained that, at common law, an indigent party had no obligation to reimburse the county for medical expenses paid. The court then reviewed the statutory language of I.C. § 31–3503, which obligates the county to pay for medical care of indigents, and of I.C. § 31–3510, which subrogates the paying county to the rights of such indigents against third persons. The court also cited I.C. § 32–1002, which allows the county to seek reimbursement from immediate relatives of poor persons to whom the

county has rendered aid. The court opined that, under either public policy or the rationale of the medical indigency statutes, it would not be sensible for the county to be limited to subrogation on existing interests of the medical indigent. The court held that the county was entitled to receive the Ropers' interest in the property in England, or in at least as much of that interest as would satisfy the amount paid to the hospital. Judge Rasmussen did not order conveyance of the Caribou County property to the county. The Ropers moved for reconsideration, on the bases that the district court did not have jurisdiction to decide the reimbursement question and that reimbursement was improper in this case. Meanwhile, Judge Rasmussen died. Judge McDermott took over the case.

Judge McDermott agreed with Judge Rasmussen's memorandum decision, that the primary support duty falls on the parents; that the Ropers had not been compelled, but had chosen, to seek county aid; that the contract allowing reimbursement, which Mr. Roper had signed in applying for county help, was enforceable; that the county commissioners had jurisdiction to decide the Ropers' ability to reimburse Caribou County for medical bills; and that the affidavit of Commissioner Anderson was sufficient to inform the court of the board of county commissioners' findings. The court therefore ordered the Ropers to assign to the county their interest in the England property. The court further restrained the Ropers from transferring or encumbering the England property until such property had been transferred to Caribou County. The Ropers appeal. We affirm the decision of the district court.

Appellants Roper allege as error the district court's acceptance of an affidavit from the chairman of the Board of County Commissioners of Caribou County, in lieu of formal findings and conclusions of the board. The Ropers contend that the trial court should not have treated such affidavit as reflective of a formal determination of the Board of Commissioners.

The standard of review to be followed by the district court in these medical indigency cases is set forth in I.C. § 31–3505, which states in relevant part that "[t]he applicant shall be entitled to judicial review of the decision of the board, in substantially the manner provided in the administrative procedures act, chapter 52, title 67, Idaho Code." The pertinent section of Title 67, I.C. § 67–5215(f)–(g), states:

"(f) The review shall be conducted by the court without a jury and shall be confined to the record. In cases of alleged irregularities in procedure before the agency, not shown in the record, proof thereon may be taken in the court. The court, upon request, shall hear oral argument and receive written briefs.

"(g) The court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court may affirm the decision of the agency or remand the case for further proceedings ..."

Appellants assert that, under this statute, the Board of Commissioners was required to make formal findings of fact, and that the district court had jurisdiction to review only final decisions of the board which had been reduced to formal findings. We agree that these requirements applied to the district court's review of the board's decision. However, we deem such requirements to have been substantially satisfied in this case.

We note at the outset the rationale for requiring an agency to make findings in contested cases:

"Pre-APA decisions of the Supreme Court requiring agencies to make findings are generally common law, for the Court used the Constitution in only a few cases and it seldom pretended to get its answer from the substantive statute. The Court's most frequent reason for requiring findings or findings and reasons has been to facilitate judicial review; Mr. Justice Cardozo is often quoted: 'We must know what a decision means before the duty becomes ours to say whether it is right or wrong.' *Unit-*

*ed States v. Chicago, M., St. P. & P.R. Co.,* 294 U.S. 499, 510–11 [55 S.Ct. 462, 467, 79 L.Ed. 1023] (1935). Mr. Justice Frankfurter explained that the requirement 'is merely part of the need for courts to know what it is that the Commission has really determined in order that they may know what to review. . . . This is the real ground for decisions which have found Interstate Commerce Commission orders wanting in necessary findings.' *City of Yonkers v. United States,* 320 U.S. 685, 694–95 [64 S.Ct. 327, 332, 88 L.Ed. 400] (1944) (dissenting opinion). The Supreme Court has written many opinions requiring findings, without any explanation of the source of the requirement; a good example is *Florida v. United States,* 282 U.S. 194 [51 S.Ct. 119, 75 L.Ed. 291] (1931), setting aside an ICC order for lack of findings, because 'there should be appropriate findings upon the evidence to support an order' and because 'it must appear that there are findings, supported by evidence, of the essential facts,' but never saying whether the requirement came from due process, from the Interstate Commerce Act, or from the common law. 282 U.S. at 212 [51 S.Ct. at 124]. The Court can, does, and should make such common law. The motivating reason usually is that a reviewing court cannot understand the agency's action unless findings and reasons are stated; an additional reason that alone should suffice to support the requirement is that a statement of findings and reasons is usually an effective protection against arbitrariness." Davis, ADMINISTRATIVE LAW TREATISE, Vol. 3 (2d ed. 1980), p. 102. And Davis adds, *id.* at p. 114, "The lower courts are uniformly requiring agencies to state findings and reasons whenever the courts determine that a *record does not sufficiently disclose the findings and reasons."* (Emphasis added.)[1]

Another treatise explains the requirement of an adequate statement of factual findings and reasons as follows:

"The Administrative Procedure Act requires that all decisions arrived at after formal hearings on the record must include a statement of 'findings and conclusions, and the reasons or basis therefor, on all the material issues of fact, law, or discretion presented on the record' [*citing* 5 U.S.C. § 557(c)(3)(A)]. The purposes of this provision . . . are to prevent arbitrary agency decisions, give the parties an explanation for the agency's decision, and help to settle the law for future cases. More importantly, the statute provides a basis for effective judicial review by requiring intelligible reasons for the agency action and removing the need for speculation on the [reviewing] court's part." 5 Mezines, Stein, Gruff, ADMINISTRATIVE LAW § 39.05 (1985).

*Accord Matlovich v. Secretary of the Air Force,* 591 F.2d 852, 857 (D.C.Cir.1978); *California Stevedore & Ballast Co. v. OSHRC,* 517 F.2d 986 (9th Cir.1975); *People of Illinois v. United States,* 371 F.Supp. 1136, 1138 (N.D.Ill.1973).

In this case, the aims of requiring formal findings are amply satisfied by Commissioner Anderson's affidavit. Although this allegation of error would have been avoided by the mere formality of having all of the commissioners sign a statement of findings containing the same information as is included in Anderson's affidavit, we do not see how appellants would be benefited by our remanding for that pur-

---

**1.** In addition to the Anderson affidavit, the record contains the county's letter denying the Ropers' initial request for assistance, which letter was signed by the three county commissioners and dated May 24, 1982. The following reasons were given in this letter for refusing indigent aid to the Ropers: that the Ropers were able to borrow the money; that Mr. Roper was capable of earning income which could apply to the hospital debts; that the Ropers had misrep-

resented the husband's employment status; that the Ropers owned property in England which could be mortgaged or sold to pay the debts; that the Ropers had personal property which could be mortgaged or sold; that Mr. Roper had foregone an opportunity to join the Teamster's Union and thereby obtain insurance, despite his having had money for the dues; and that certain of the bills submitted to the county had not been timely filed.

pose. Certainly the lengthy affidavit of Anderson informs both appellants and this Court of the reasoning behind the board's decision. Appellants are in no way hampered, in planning their strategy for pursuing this appeal, by the fact that all of the commissioners did not sign the findings. The county asserts that the findings are representative of the commissioners' holding. We therefore find the affidavit of Commissioner Anderson to be satisfactory for purposes of our review of these facts.

■ Appellant cites several cases assertedly standing for the proposition that formal findings of an agency are absolutely necessary for review. *See, e.g., Workman Family Partnership v. City of Twin Falls,* 104 Idaho 32, 655 P.2d 926 (1982) (zoning case under Administrative Procedure Act, wherein the Court noted that the informal letter offered as findings for review was nowhere shown to have been authorized by the agency); *State v. Mason,* 102 Idaho 866, 643 P.2d 78 (1982) (criminal case, wherein the Court refused to hear a case because the record was deficient under I.A.R. 28); *Gay v. County Commissioners,* 103 Idaho 626, 651 P.2d 560 (Ct.App. 1980) (zoning case under Administrative Procedure Act, wherein no transcribable record had been taken of the agency proceedings); *Cooper v. Bd. of County Com'rs of Ada County,* 101 Idaho 407, 614 P.2d 947 (1980) (zoning case under Administrative Procedure Act). These cases are distinguishable from the present one, first, because the findings presented for our review in these cases were not as extensive as those presented in Anderson's affidavit herein; and second, because these cases were based on the idea that the findings failed to satisfy either a specific appellate requirement (*Mason*) or the Administrative Procedure Act (*Workman Family Partnership, Gay,* and *Cooper*). The board's decision here involved does not fall under the Administrative Procedure Act, except as to the provision for judicial review found in I.C. § 67–5215(f)–(g) and incorporated by reference within I.C. § 31–3505. To the extent that our decision in *IHC Hospitals, Inc. v. Bd. of Com'rs.,* 108 Idaho 136, 697 P.2d 1150 (1985), holds to the contrary, it is hereby overruled. While we recognize that, in any case before this Court, specificity in the findings and reasons of the lower tribunal is vital, we find within the Anderson affidavit, submitted by the county, an adequate explanation of the board's decision. We therefore decline to overturn the trial judge's discretionary acceptance of the affidavit in fulfillment of the findings requirement.

■ Appellants contend that the district court did not have jurisdiction to hear the reimbursement question, because that issue had allegedly not been presented to the Board of County Commissioners during the board hearings in the *Roper* case. We first note that the question of whether the county could require reimbursement from Mrs. Roper's remainder interest in the England property is a legal, rather than a factual, one. Therefore, this Court and the district court were not bound by the county's decision as to whether a future interest is subject to be taken under the county's right of reimbursement under I.C. § 32–1002. *See,* regarding nature of review, *Clark v. St. Paul Property and Liability Ins. Companies,* 102 Idaho 756, 639 P.2d 454 (1981); *Harding v. Home Inv. & Sav. Co.,* 49 Idaho 64, 297 P. 1101 (1930). Furthermore, we find questionable the appellants' assertion that the board was powerless to consider that issue unless the parties presented it to them for consideration.

The trial court found:

"Although the statutes never precisely state that the county must determine whether or not a person is medically indigent, the county commissioners must care for the medically indigent. *Idaho Code* § 31–3503; application for assistance must be made to the county commission, *Idaho Code* § 31–3504; and the application is to be approved or denied by the county commissioners, *Idaho Code* § 31–3505.

"As the statutes imply that a determination of 'medical indigency' must be made by the commission by evaluating

the financial status of the applicant, there is also an implicit grant of authority that the commissioners may also make a judgment as to how much the applicant is able to pay himself. To hold otherwise would require the county to totally grant the medical payments and free the indigent from all liability, or totally deny any medical aid. The commission is a fact finding body, and if it has the power to determine whether the applicant is indigent, it should also be given wide latitude to determine the recipient's reimbursement obligation.

"In their fact finding capacity, the commissioners heard evidence regarding the financial circumstances surrounding Nathan's birth, the various representations about property owned by the Ropers, and the employment of the Ropers during the pendency of this action. The commission was in a position of authority both to hear the evidence and decide whether reimbursement was proper and what amount should be repaid.

"This implied power of the commission has recently been set forth in statutory language in *Idaho Code* § 31–3510A (1983 Supp.). Although the statute was not applicable to the Roper's case because the law was not in effect at the time of the earlier proceedings, it still reflects the scope of the commission determination:

> By the acceptance of county assistance, an applicant agrees to reimburse the county from which assistance is received, for any portion of the hospitalization or other medical expense paid on behalf of the applicant *if the county commissioners find that the applicant is able to pay any portion of the charges over a reasonable period of time.* (Emphasis added).

"The Board of County Commissioners had the implied power to determine if the Ropers were able to repay a portion of the medical charges, and to so assess the Ropers if the commission found that they were capable of reimbursing the county."

We agree with this reasoning of the lower court and hold that the commissioners had inherent power to consider the question of reimbursement. The district court properly considered the reimbursement question on appeal from the county board's decision. Since appellants appeal only from the lower court's jurisdiction, and not from its decision that the county was entitled to a transfer of the England property, our preceding discussion disposes of the issues pertinent to this case.

The holding of the trial court is affirmed. No costs or attorney's fees on appeal.

DONALDSON, C.J., and BISTLINE and HUNTLEY, JJ., concur.

BISTLINE, Justice, specially concurring.

I have concurred in the Court's opinion and judgment, and add only that I feel we are affirming because the district court achieved substantial justice. That it did so on the "equity" side of the court cannot be much doubted where our decision holds that the district court, though acting in an appellate capacity, had "inherent power to consider the question of reimbursement." This holding may serve as precedent in future appeals from administrative agencies and boards of county commissioners, and is generally in tune with the views recently expressed in *Daley v. Blaine County*, 108 Idaho 614, 701 P.2d 234 (Sup. Ct.1985) (Bistline, J., concurring):

> More than that, however, the most alarming aspect of our decision today is the debilitating effect which the present appellate review procedures, or perhaps better said, the appellate review procedures as presently interpreted and applied, have on our district court—which in days past were the only genuine protection which Idaho citizens had against the burgeoning bureaucracy. In former times—not all that distant—the district court's judgment in this case would have been applauded, not appealed....

There, unlike this case, we perceived no inherent power in a district court to do substantial justice, but instead confined it

to the performance of a purely appellate function *so as to do injustice.*

### ADDENDUM

Since the foregoing was penned, I have now received the views of Justice Bakes outlined in his dissenting opinion. I agree with what he has written, other than where he states that "The judgment also attempts to affect the title of property ... in faraway England." An equity court which is cloaked with *in personam* jurisdiction can exercise that jurisdiction to indirectly affect realty outside its own jurisdiction.

Notwithstanding my agreement with Justice Bakes, I continue to join the Court's opinion authored by Justice Shepard, doing so on the basis of what I initially wrote— substantial justice achieved by a court of equity possessed of inherent power. If this Supreme Court has the inherent power it has declared for itself, perhaps there is nothing too far amiss in declaring a similar inherent power in our district courts.

BAKES, Justice, dissenting:

I agree with the ultimate goal of the county, the district court, and the majority of this Court, *i.e.,* that property owned by indigents should be used to reimburse the county. However, I dissent from the application of convoluted procedures in this case, which have no basis in the law, in achieving that goal. In the first remand to the county from the district court, the county was either unwilling, reluctant, or undecided in making a final decision on Roper's indigency status. When the issue was forced by the Ropers and IHC's application for "extraordinary appellate relief," *ante* at 3 (whatever that entails) to the district court, the county ultimately decided to settle the case, pay the hospital, and rely on its right of reimbursement. At that point, the appeal should have been viewed as being fully settled and finalized and dismissed. Instead, the county injected into the case the issue of reimbursement and the district court and this Court, both on appeal, changed the case from one involving an appeal from an indigency determination by the board of county commissioners to a judgment against the indigents. The judgment also attempts to affect the title of property both in Idaho and far away England.

The county's rights should have been adjudicated as follows. Once the county settled with IHC for the payment of medical costs, the county, by virtue of I.C. § 32–1002 and contractual provisions, became a creditor of the Ropers by statutory subrogation with the right to seek reimbursement for the medical costs. The county should have proceeded just as any other creditor would have proceeded against the Ropers, by filing a complaint in the district court, reducing the complaint to judgment, and executing on the property of the debtors. The district court would have no problem in executing on the Idaho property. However, the district court would be totally without jurisdiction to affect any right in the property located in England. The county would be required to take its Idaho judgment and, by whatever means available in the law of England, to have the judgment validated in England and levy and execute on the English property through the English courts.

The county commissioners had no constitutional or statutory jurisdiction to litigate its own right of reimbursement. After paying the medical claim of the hospital, they simply become a creditor and must assert the creditor's rights through a separate district court action just as any other creditor must do. Neither can the district court, on appeal from an indigency ruling of the county commission, grant a judgment against the indigents without the county filing a complaint and properly setting the issues according to the rules of civil procedure. This case truly represents "extraordinary appellate relief."